## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

(1)   JANICE BUSH, as Special
      Administrator for the Estate of
      Ronald Garland

              Plaintiff,

v.                                                Case No.: 19-CV-0098-GKF-FHM

(2)   BRET BOWLING, in his official and
      individual capacities,

              Defendants.

### PLAINTIFF'S MOTION FOR SANCTIONS

RESPECTFULLY SUBMITTED,

BRYAN & TERRILL LAW, PLLC
J. Spencer Bryan, OBA # 19419
Steven J. Terrill, OBA #20869
3015 E. Skelly Dr., Suite 400
Tulsa, Oklahoma 74105
Tele/Fax:    (918) 935-2777
jsbryan@bryanterrill.com

February 10, 2020

# T A B L E   O F   C O N T E N T S

TABLE OF AUTHORITIES..................................................................................... 2

I.   STATEMENT OF MATERIAL FACT ........................................................... 6

  A.   FACTS REGARDING THE LIKELY CONTENT OF THE MISSING VIDEO........................ 6

  B.   FACTS REGARDING VIDEO PRESERVATION AND THE DUTY TO
       PRESERVE ................................................................. 10

II.  ARGUMENTS AND AUTHORITIES............................................................ 12

  A.   DEFENDANTS HAD A DUTY TO PRESERVE SECURITY VIDEO FROM ALL
       CAMERAS IN THE BOOKING AREA AT THE CCJC DURING THE INCIDENT ................ 12

  B.   STANDARDS ON A MOTION FOR SANCTIONS ....................................... 16

    1.   THE DEGREE OF ACTUAL PREJUDICE ................................... 18

    2.   THE AMOUNT OF INTERFERENCE WITH THE JUDICIAL
         PROCESS ................................................................ 19

    3.   THE CULPABILITY OF THE LITIGANT ................................... 20

    4.   WHETHER THE COURT WARNED THE PARTY IN ADVANCE .................... 21

    5.   THE EFFICACY OF LESSER SANCTIONS ................................. 22

  C.   ASSUMING ARGUENDO THE COURT DOES NOT CONSIDER DEFAULT IS
       NECESSARY, ESTATE REQUESTS A LESSER SANCTION ......................... 27

III. CONCLUSION.................................................................... 28

## TABLE OF AUTHORITIES

*Anderson v. Cryovac*,
    862 F.2d 910 (1st Cir.1988) ................................................................................. 24

*Aramburu v. Boeing Co.*,
    112 F.3d 1398 (10th Cir.1997) ............................................................. 19, 23, 24

*Brigham Young University v. Pfizer, Inc.*,
    262 F.R.D. 637 (D. Utah 2009) ...................................................................... 20

*Brewer v. Quaker State Oil Refining Corp.*,
    72 F.3d 326 (3d Cir.1995) ................................................................................ 21

*Cache La Poudre v. Land O'Lakes, Inc.*,
    244 F.R.D. 614 (D. Colo. 2007) ..................................................................... 12

*Coates v. Johnson & Johnson*,
    756 F.2d 524 (7th Cir.1985) ............................................................................ 23

*Computer Associates Intern., Inc., v. American Fundware, Inc.*,
    133 F.R.D. 166 (D. Colo. 1990) ..................................................................... 25

*Connor v. Sun Trust Bank*,
    546 F. Supp. 2d 1360 (N.D. Ga. 2008) ......................................................... 13

*Doe v. Norwalk Community College*,
    248 F.R.D. 372 (D. Conn. 2007) ................................................................... 13

*E.E.O.C. v. Dillon Companies, Inc.*,
    839 F.Supp.2d 1141 (D. Colo.2011) .............................................................. 24

*Ehrenhaus v. Reynolds*,
    965 F.2d 916 (10th Cir.1992) ................................................................ 17, 18, 22

*Essenter v. Cumberland Farms, Inc.*,
    2011 WL 124505(N.D.N.Y.2011) ............................................................ 14, 17

*Estate of Trentadue v. United States*,
    397 F.3d 840 (10th Cir.2005) ......................................................................... 27

*FDIC v. Daily*,
    973 F.2d 1525 (10th Cir.1992) ....................................................................... 23

*Gentex Corp. v. Sutter*,
    2011 WL 5040893 (M.D.Pa.2011) ............................................................ 21, 24

2

*Gocolay v. New Mexico Federal Savings & Loan Assoc.*,
    968 F.2d 1017 (10th Cir. 1992) ........................................................ 23, 24

*Henning v. Union Pacific R. Co.*,
    530 F. 3d 1206 (10th Cir. 2008) ............................................................ 27

*In re Baker*,
    744 F.2d 1438 (10th Cir.1984) ............................................................. 17

*In re Krause*,
    367 B.R. 740 (D.Kan.2007) .................................................................. 17

*In re Standard Metals*,
    817 F.2d 625 (10th Cir.1987) ............................................................... 23

*In re Wechsler*,
    121 F. Supp. 2d 404 (D. Del. 2000) ..................................................... 18

*King v. Am. Power Conversion Corp.*,
    181 Fed.Appx. 373 (4th Cir. 2006) ...................................................... 15

*Kounelis v. Sherrer*,
    529 F.Supp.2d 503 (D.N.J. 2008) ......................................................... 15

*LaJocies v. City of North Las Vegas*,
    2011 WL 1630331 (D. Nev. April 28, 2011) ........................................ 15

*Lee v. Max Intern., L.L.C.*,
    638 F.3d 1318 (10th Cir. 2011) ............................................................ 17

*Mathis v. John Morden Buick, Inc.*,
    136 F.3d 1153 (7th Cir.1998) .............................................................. 16

*McCargo v. Texas Roadhouse, Inc.*,
    2011 WL 1638992 (D.Colo. 2011) ....................................................... 19

*Medcorp, Inc. v. Pinpoint Technologies, Inc.*,
    2010 WL 2500301 (D.Colo. 2010) ....................................................... 19

*Micron Tech., Inc. v. Rambus Inc.*,
    645 F.3d 1311 (Fed. Cir. 2011) ............................................................ 23

*Nat'l Hockey League v. Metropolitan Hockey Club*,
    427 U.S. 639 (1976) ....................................................................... 17, 23

*Nucor Corp. v. Bell*,
    251 F.R.D. 191 (D.S.C. 2008) .............................................................. 13

3

*Paramount Pictures Corp. v. Davis*,
  234 F.R.D. 102 (E.D. Pa. 2005) ............................................................................ 18

*Patterson v. C.I.T. Corp.*,
  352 F.2d 333 (10th Cir.1965) ............................................................................... 23

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  685 F.Supp.2d 456 (S.D.N.Y.2010) ...................................................................... 12

*Peschel v. City of Missoula*,
  664 F.Supp.2d 1137 (D.Mont.2009) ............................................................... 15, 27

*Phillip M. Adams & Associates, L.L.C. v. Dell, Inc.*,
  621 F.Supp.2d 1173 (D. Utah 2009) .................................................................... 23

*Phillips Electronics North America Corp. v. BC Technical*,
  773 F.Supp.2d 1149 (D. Utah 2011) ............................................... 17, 21, 22, 25

*Rattray v. Woodbury County, Iowa*,
  761 F.Supp.2d 836 (N.D. Iowa 2010) ............................................................ 13, 19

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
  306 F.3d 99 (2d Cir. 2002) ................................................................................... 17

*Silvestri v. Gen. Motors Corp.*,
  271 F.3d 583 (4th Cir. 2001) ......................................................................... 13, 15

*Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*,
  357 U.S. 197 (1958) ............................................................................................. 23

*SonoMedica, Inc. v. Mohler*,
  2009 WL 2371507 (E.D.Va. July 28, 2009) ......................................................... 28

*Switzer v. Much, Shelist, Freed, Denenberg, Ament, Bell & Rubenstein, P.C.*,
  214 F.R.D. 682 (W.D.Okla 2003) ......................................................................... 28

*Turner v. Public Service Co. of Colorado*,
  563 F.3d 1136 (10th Cir. 2009) ..................................................................... 16, 17

*United States v. Koch Indus., Inc.*,
  197 F.R.D. 463 (N.D.Okla.1998) .......................................................................... 22

*Usavage v. Port Auth. of N.Y. & N.J., No. 10 Civ. 8219 (JPO)*,
  2013 WL 1197774 (S.D.N.Y. Mar. 26, 2013) ...................................................... 14

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
  269 F.R.D 497 (D.Md. Sept. 9, 2010) ............................................................. 12, 13

*Zubulake v. U.B.S. Warburg, L.L.C.*,
    220 F.R.D. 212 (S.D.N.Y. 2003) ............................................................ 14

*Zubulake v. UBS Warburg LLC*,
    229 F.R.D. 422 (S.D.N.Y.2004) ............................................................ 13

## OTHER AUTHORITY

Advisory Committee Notes to Rule 37(e) – December 1, 2015 ................................. 12

Fed. R. Civ. P. 37 ..................................................................................... 1, 12, 16

Okla. Admin. Code 310:670-5-2(3) ..................................................................... 9

Okla. Admin. Code 310:670-5-2(5) ..................................................................... 9

Okla. Admin. Code 310:670-5-2(28)(B) ............................................................. 10

U. Balt. L. Rev. 381, 390 (2008) ......................................................................... 12

Pursuant to Fed. R. Civ. P. 37, and this Court's inherent authority, Janice Bush, as Special Administrator for the Estate of Ronald Garland (hereinafter "Estate"), submits this Motion for Sanctions against the Board of County Commissioners of Creek County, Bret Bowling, Lance Prout, and Joe Thompson, in their official and individual capacities, and Chris Fetters, Brandon Fulks, and Jeff Labbee.

## I.

### STATEMENT OF MATERIAL FACT

**A.     FACTS REGARDING THE LIKELY CONTENT OF THE MISSING VIDEO**

1.      This case involves the inhumane treatment of Ronald Garland at the Creek County Justice Center (CCJC) on June 10, 2017 that culminated in a second use of force that resulted in Ronald's premature death. (Doc. 40, 178-1).

2.      Relevant to this motion are critical events in the booking area preceding the second use of force incident, and the missing video of those events that would depict: (1) a previous use of force on Ronald in the doorway to the medical cell; (2) deliberate antagonizing behaviors by staff outside the detox cell door that contributed to Ronald's worsening condition; and (3) whether the CCJA nurse, or anyone else, performed any welfare checks on Ronald through the detox cell door. (*See* Ex. 1, Incident Reports; Ex. 2, OSBI Interview of Honeycutt; Ex. 3, Diagram of CCJC; Ex. 5, Untimed Progress Note by Keri Janes).

3.      A forensic review of the three CCJC DVRs, produced in response to an Order as being responsive to video of the incident, concluded that missing video from the booking room camera was not retrievable. (*See* Ex. 4, Declaration of Avansic Representative; *see also* Docs. 141, 156).

4.      On June 10, 2017, Ronald was a pretrial detainee at the CCJC on a DUI charge; he was moved from general population to a detox cell in booking after exhibiting odd behavior in the housing unit consistent with severe detoxing. (*See* Ex. 5, Progress Note; *see also* Doc. 40, ¶ 20).

5.      The CCJC air conditioner was malfunctioning at the time; Ronald was sweating profusely and requesting water. (*See* Ex. 6, Fetters Interview, Ex. 7, Minutes of CCPFA (July 6, 2017); Ex. 24, Murphy depo., p. 12:11-22).

6.      After jailers placed Ronald in the detox cell, video from inside the cell shows Defendant CCJC supervisor Chris Fetters throwing two cups of water in Ronald's face. Although Ronald was asking for water, none was provided. The detox cell is a "dry" cell meaning there is no running water or toilet for people locked inside. (*See* Ex. 8, Photo of Fetters throwing water at Ronald; Ex. 24, p. 19:13-16)

7.      A witness told the OSBI that Fetters threw the water at Ronald after asking other jailers and facility nurse Keri Janes (Janes) if they "wanted to see something funny?" (*See* Ex. 2).

8.      Janes has denied any knowledge of Fetters abusing and humiliating Ronald despite the witness placing her at the doorway when Fetters abused Ronald. (*See* Ex. 9, Janes depo, pp. 188-190).

9.      The missing video from the camera in the booking area would identify the people standing near Fetters when he issued the insulting comment. Based on the witness, that group of people included Janes. (*Compare* Ex. 2, *with* Ex. 10, Sample Screenshot from camera with missing video)

10.     Jailers then handcuffed Ronald and escorted him out of the detox cell. (*See* Ex. 1, 5). Although the booking room camera is trained on the detox cell door and the adjacent medical cell, there is no video of Ronald exiting the detox cell, where jailers took Ronald, or what was done to him.

11.     Ronald's CCJC medical records indicate that he was taken to the adjacent medical cell to see Janes. (*See* Ex. 5). Following the encounter with Janes, three incident reports document that Ronald stopped as he was being escorted out of the medical cell. (*See* Ex. 1).

12.     These reports document that Fetters and/or jailer Bailey Smalley used force on Ronald in the doorway of the medical cell. *Id*. This use of force is not described in any detail and occurred in front of Janes. *Id*.

7

13.     A use of force in the doorway to the medical cell would be visible from the camera in the booking area, but there is no video of what Ronald did that warranted a use of force (if anything), if he even stopped in the doorway, or why he stopped, if that's what he did. (*See* Ex. 10).

14.     There is no documentation from Janes that a use of force even happened in the doorway to the medical cell, there is no documentation of Janes assessing Ronald in response to the use of force, and there is no Segregation Activity Record (SAR) documenting Ronald's condition over time. (*See* Ex. 5).

15.     Instead, Ronald was sent back to the dry detox cell where he remained for the next 3+ hours. (*See* Ex. 5; *see also* Ex. 25, Preserved Video, Video from County (Initial), Cam1).[1]

16.     During this time, the camera in the detox cell does not show anyone entering the cell to check on Ronald. (*See* Ex. 25, Video from County (Initial) Cam1).

17.     A witness told the OSBI that jailers stood outside the detox cell door taunting Ronald and yelling "hey!" like they were trying to startle him, and that Ronald responded by yelling. (*See* Ex. 2; *see also* Ex. 24, p. 13:21-25 ("[O]ne of the CO's, he just got really upset. And that's when it all happened.")).

18.     Defendant Labbee admitted that he thought Ronald was "obnoxious," and another witness told the OSBI that it appeared the jailers were "mad" at Ronald. (*See* Ex. 11, Labbee Interview; *see also* Ex. 12, Murphy Interview; Ex. 24, pp. 11:10-17, 13:21-25)

19.      Despite a policy requiring staff to prepare a SAR to monitor people in the detox cell, there is no SAR for Ronald's detention and no documentation of checks at any interval. Only monitoring by remote means violates the Oklahoma Jail Standards. (*See* Ex. 13, Segregation policy, SAR example; *see also* Ex. 15, Okla. Jail Standards, 310:670-5-2(3) (requiring visual sight check "at least*"* once every hour "which shall include all areas of the cell and such sight checks shall be documented.").

---

[1] Instructions for the video player are included with Exhibit 25, along with all available video produced by two other agencies, including: (1) the initial video production by the county; (2) the supplemental video production by the county (all post-incident); (3) the video production from the OSBI (received from the county); and (4) the video production from the Oklahoma Office of the Medical Examiner (also received from the county). The video at issue is not among the production from the county or any agency that received video from the county.

8

20.      Janes made one untimed entry in Ronald's Progress Notes. That entry gives the appearance that Janes looked-in on Ronald through the window on the cell door, but the time for that entry reads only "21__". (*See* Ex. 5). There is no video to corroborate the entry.

21.      Janes back-charted at least one other entry relating to Ronald. *Id.*

22.      Video from the camera in the booking area would show who went to Ronald's door, when they were there, and what they were doing. (*See* Ex. 10). This missing video would either corroborate or refute Janes' entry.

23.      After 3 hours of Ronald in the detox cell, video from the camera in the booking area suddenly begins at 9:33:36, just moments before Fetters and jailers Labbee and Fulks go to the detox cell door. (*See* Ex. 14, Screenshot of when booking camera video begins; *see also* Ex. 16, Video of Ronald's removal from the detox cell).

24.      Prior to opening the door, Fetters sent Labbee and Fulks away to get the restraint chair as Fetters has the detox cell door opened in violation of Oklahoma Jail Standard 310:670-5-2(5). (*Compare* Ex. 6, *with* Ex. 15). When Fetters opened the door, he grabbed Ronald's arm and forcefully threw him to the ground. (*See* Ex. 16). Fetters then yelled out that Ronald "swung" on him. The claim is not supported by the video. (*Compare* Ex.11 *with* Ex. 16).

25.      Once on the ground, Fetters, Fulks, and Labbee began beating Ronald using "hammer" fists. The beating ended when the jailers tired of punching Ronald. Ronald was then lifted and taken to the restraint chair where jailers shoved him deep in the seat while forcefully pushing his head downward between his knees in a jackknife position. Ronald was held in this position for nearly a full minute. (*See* Ex. 6; *see also* Ex. 16, Ex. 17, Video of placement in restraint chair).

26.      Ronald was non-responsive once Fetters finally lifts his head up. *Id.* Ronald suffered a cardiac arrest and anoxic brain injury. (*See* Ex. 18, SJMC Records). He was transported to St. John's, but his condition was beyond medical help and family removed life-sustaining measures. *Id.*

9

27.     Ronald died on June 18, 2017. *Id.*

28.     Video capturing images of Ronald, and what he experienced outside the detox cell door, was saved and then destroyed. (*Compare* Ex. 19, Prout depo, pp. 191:24 - 192:8 *with* Ex. 4).

29.     The camera in the booking area would have captured images of Ronald exiting the medical cell, the alleged justification for using force on Ronald, and the use of force itself. (*See* Ex. 10).

30.     There is no video of Ronald exiting the cell, the conduct allegedly justifying the use of force in the doorway to medical, or the use of force itself, and there are no medical records documenting the use of force or any evaluation of Ronald's condition in response to the force used. (*See* Ex. 25; Ex. 4).

31.     The camera in the booking area would have captured images of jailers or the nurse if they checked on Ronald from the detox cell door. (*See* Ex. 10).

32.     Additionally, the camera in the booking area would have also captured images of jailers or the nurse if they antagonized Ronald from outside the detox cell door. *Id.*

**B.**     **FACTS REGARDING VIDEO PRESERVATION AND THE DUTY TO PRESERVE**

33.     The Oklahoma Administrative Code applicable to jails defines a "serious injury" as "life threatening or requiring transfer to outside medical facility." (*See* Ex. 15, O.A.C. 310:670-5-2(28)(B)). "Serious injuries" trigger notice to the Oklahoma State Department of Health Jail Inspection Division (OSDH-JID) on the following business day. *Id.*

34.     To this day, nobody from the Creek County Sheriff's Office has reported Ronald's death to the OSDH-JID.

35.     Following the Incident, Defendant Jail Administrator Lance Prout (Prout) testified that *all* video from the CCJC video surveillance system was saved. (*See* Ex. 19, p. 192:7-8) ("From the time he came in till the time he left, we put it all on a big portable USB drive.").

36.     Defendants have produced 315 individual video files that include images of (1) Ronald arriving at the CCJC at 4:00 a.m. and sitting in pre-booking for nearly 4 hours; (2) Ronald being escorted

10

to a housing unit at 7:50 a.m.; (3) Ronald spending his entire day in a general population housing unit; (4) his removal from the housing unit; (5) Ronald's time inside the detox cell; (6) the second use of force on Ronald and his placement in the restraint chair; and (7) EMTs transporting Ronald from the CCJC after the second incident. (*See* Ex. 25).

37.     Conspicuously absent from this video preservation effort are any images of Ronald (1) being taken to the medical cell; (2) the use of force on Ronald in the doorway to medical; or (3) the conduct of staff outside the detox cell door. *Id*.

38.     On June 19, 2017, Undersheriff Joe Thompson provided the OSBI with 2 DVD's of video from the CCJC as part of a criminal investigation into Ronald's death. (*See* Ex. 20, Report of Investigative Activity, OSBI Report No.OSBI2017-770/4).

39.     On June 20, 2017, death investigator Megan Harris from the Office of the Chief Medical Examiner (OCME), prepared a report stating the CCJC had video and would provide copies to the OCME. (*See* Ex. 21, Request for Analysis).

40.     On July 6, 2017, Estate served the Sheriff's Office and the Board of County Commissioners with a preservation letter that included notice to preserve all video at the CCJC. (*See* Ex. 22, Preservation Letter).

41.     On December 5, 2019, this Court entered an Order compelling production of the DVRs in use at the CCJC at the time of the Incident. (Doc. 156).

42.     On February 7, 2020, Estate received a report from Avansic, a forensic e-discovery company that examined 3 DVRs produced by Defendants. (*See* Ex. 4).

43.     Avansic's examination revealed the following: (1) DVR 1 was completely gutted and contained no hard drive, CPU, or any useful equipment whatsoever; (2) DVR 2 was in service in 2019, but the system was inoperable; (3) DVR 3 was in service in 2018 but the system was inoperable; and (4) there were no files or logs available for June 9, 2017 through June 24, 2017. *Id*.

11

44.     The video Prout saved, which would necessarily include the missing video referenced above, is not available despite preservation efforts that saved all video and Estate's separately issued preservation letter.

45.     In 2015, Judge Dowdell sanctioned Creek County for destroying video at the CCJC in a different jail case. (*See* Ex. 23, Order in *Bloom v. Toliver*).

## II.

### ARGUMENTS AND AUTHORITY

### A.     DEFENDANTS HAD A DUTY TO PRESERVE SECURITY VIDEO FROM ALL CAMERAS IN THE BOOKING AREA AT THE CCJC DURING THE INCIDENT

"[Ordinarily] the duty to preserve evidence is triggered by the filing of a lawsuit. However, the obligation to preserve evidence may arise even earlier if a party has notice that future litigation is likely." *Cache La Poudre v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 621 (D.Colo.2007) (internal quotations and citations omitted). "[T]he duty 'may arise from statutes, regulations, ethical rules, court orders, or the common law. . . , a contract, or another special circumstance." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D 497 (D.Md. Sept. 9, 2010) (*citing* 37 U. Balt. L. Rev. 381, 390 (2008))).

As clarified by the Advisory Committee Notes to Amended Rule 37(e),

Although the rule focuses on the common-law obligation to preserve in the anticipation or conduct of litigation, courts may sometimes consider whether there was an independent requirement that the lost information be preserved. <u>Such requirements arise from many sources — statutes, administrative regulations, an order in another case, or a party's own information-retention protocols</u>.

*See* Advisory Committee Notes to Rule 37(e) – December 1, 2015 (emphasis added).

"It is well established that the duty to preserve evidence arises when a party reasonably anticipates litigation. Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F.Supp.2d 456, 466 (S.D.N.Y.2010) (internal citations and quotations omitted). The duty to preserve means action

must be taken to preserve evidence, meaning that it is not lost, destroyed, inadvertently or negligently overwritten, or intentionally wiped out, and that it is available to be produced to the other side. *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y.2004).

Additionally, it is important to recognize under the facts of this motion that ". . . agency law is directly applicable to a spoliation motion, and the level of culpability of the agent can be imputed to the master." *Victor Stanley, Inc.*, 269 F.R.D. at 516 (citing *Nucor Corp. v. Bell*, 251 F.R.D. 191, 198-99 (D.S.C. 2008) (agent's willful "alteration or destruction of relevant data" on laptop was directly attributable to defendant); *Connor v. Sun Trust Bank*, 546 F. Supp. 2d 1360 (N.D. Ga. 2008) (agent's bad faith destruction of email was attributable to defendant); accord *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 592 (4th Cir. 2001) (concluding that later-discharged attorney's actions could be imputed to plaintiff)).

In the present case, it is undisputed that all CCJC video was initially saved. A preservation letter also issued on July 6, 2017. Accordingly, there is no reason any video should be missing, and the decision to save all video supports the inference that Defendants knew that future litigation or criminal proceedings were reasonably foreseeable before video was destroyed. Video before and after the first use of force was saved, and there is no dispute that the booking room camera would have captured images of Ronald as he was escorted to and from the detox cell, and there is no dispute that same camera would have documented all events occurring immediately outside the detox cell door, including events the Defendants intend to rely on as part of their defense. The Incident also triggered reporting requirements to the state, and written reports by Fetters and others.

Given Fetters' justification for assaulting Ronald, and Ronald's injuries, the Defendants knew or should have known that all video from the booking area would be critical to investigators and prosecutors. *See Rattray v. Woodbury County, Iowa*, 761 F.Supp.2d 836, 847 (N.D. Iowa 2010) (finding that potential criminal action triggers duty to preserve), *see also Doe v. Norwalk Community College*, 248 F.R.D. 372,

377-78 (D.Conn. 2007) (duty to preserve triggered by criminal investigation). This is presumably why all video was saved in the first instance, which does not explain why video was later destroyed.

Further, once the duty to preserve attaches, a party must save any evidence that it "reasonably should know is relevant" to an anticipated action. *Zubulake v. U.B.S. Warburg, L.L.C.*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003); *see also Usavage v. Port Auth. of N.Y. & N.J., No. 10 Civ. 8219 (JPO)*, 2013 WL 1197774, at *10 (S.D.N.Y. Mar. 26, 2013) (acknowledging that, while the duty to preserve video surveillance does not include "all footage," it does encompass the preservation of all "potentially relevant footage"). Under this objective standard, there is no dispute that Defendants had a duty to preserve video from the camera in the booking area that depicted Ronald, any medical checks, or use of force incidents throughout the duration of the detention and Incident. *See Essenter v. Cumberland Farms, Inc.*, 2011 WL 124505*7 (N.D.N.Y.2011) (". . . there is no doubt that a video depicting the time before, during, and after an incident is relevant to determine what actually happened at the moment the injury occurred.").

Beyond destroying the video, there is no evidence that any Defendant notified the OSBI or the District Attorney's Office that other video was initially available, or that Defendants destroyed video of a use of force incident. Nor is there any evidence of Bowling or the leadership for Creek County taking any steps to investigate the destruction of video or hold anyone accountable for its loss.

Furthermore, whether the individual Defendants directly participated in the destruction is not relevant because they have acquiesced in the spoliation precisely because they benefit from the misconduct. They knew or should have known of Ronald's injuries, their state law reporting requirements, and their preservation duties as memorialized in the 2015 order from Judge Dowdell. These Defendants had a preservation duty, and there is no evidence that any of them took affirmative steps to protect the video, or subsequently report the destruction to law enforcement. Allowing individual Defendants to escape sanctions under these circumstances would encourage the bad faith destruction of evidence by strangers to potential litigation. The harm is magnified where municipal liability is conditioned on proving

14

a constitutional violation by a subordinate. For this reason, courts have issued terminating sanctions in similar situations.

In *Silvestri v. General Motors Corp.*, 271 F.3d 583 (4th Cir.2001), the Fourth Circuit dismissed a products case for failure to preserve even though the plaintiff did not own the vehicle in question and did not have legal control over it. *Id.* at 591 ("In this case, it is true that Silvestri did not own the vehicle, nor did he even control it in a legal sense after the accident because the vehicle belonged to his landlady's husband."). Similarly, in *King v. Am. Power Conversion Corp.*, 181 Fed.Appx. 373 (4th Cir.2006) the plaintiff's experts believed a fire at issue had been caused by a faulty computer power source. Before suit, the plaintiff failed to take steps to safeguard the power source, which was discarded by an unrelated party, and the defendant had no chance to inspect it. The Fourth Circuit affirmed dismissal because the defendant had "suffered irreparable prejudice" and could not adequately defend itself against plaintiff's claims. *Id.* at 377-78.

There are several other instances in which district courts have granted adverse inference instructions in these circumstances. *See Kounelis v. Sherrer*, 529 F.Supp.2d 503 (D.N.J.2008) (permitting an adverse inference instruction against a defendant because surveillance video evidence of an alleged assault by prison guards was lost because it was never downloaded and recorded onto a videotape); *LaJocies v. City of North Las Vegas*, 2011 WL 1630331 (D.Nev. April 28, 2011) (permitting adverse inference instruction against defendants where surveillance video and photographs of alleged prison assault were lost); *Peschel v. City of Missoula*, 664 F.Supp.2d 1137 (D.Mont.2009) (granting spoliation sanction of *de facto* default judgment against defendants because dashboard video of the arrest at the core of the claim was lost after being uploaded to a police department computer and viewed by several officers).

Here, Defendants had a duty to preserve all video that could reasonably assist in determining the veracity of any claims and contentions made by the employees or the Estate, or that would assist investigators or prosecutors. Defendants' duty was triggered when video was preserved in fact and

15

cemented by a preservation letter dated July 6, 2017. The Defendants had video evidence that would detail every minute of activity for the entirety of Ronald's detention in the booking area to include: (1) Ronald's conduct and behaviors when he exited the detox cell the first time; (2) Ronald returning to the medical cell; (3) whatever conduct Defendants' claim justified the use of force on Ronald as he exited the medical cell; and (4) any behaviors or conduct by Janes or jailers outside the detox cell door in the time leading to the fatal use of force incident; (5) the length of interactions with persons outside the detox cell (if any); and (6) the identification of other potential witnesses. But instead of preserving video, Defendants destroyed all video that would allow a jury to assess the initial use of force and what happened outside the detox door in the critical hours that preceded the Incident. There is no legitimate explanation for robbing the Estate of this video given the comprehensive efforts to save earlier video of Ronald's entire day inside the general population housing unit.

Given the admission that all video was saved, which necessarily included the now-missing video, there is no reasoned legal justification for it turning up missing in the face of a preservation letter and an ongoing criminal investigation unless the destruction was intended to manipulate the evidence, to manufacture justifications after-the-fact, suppress the truth, obstruct justice, and gain a litigation advantage. With these considerations in mind, the Court must evaluate a proper sanction.

B.    STANDARDS ON A MOTION FOR SANCTIONS

"[P]laintiffs must be 'diligent in the defense of their own interests,' and should seek sanctions under Federal Rule of Civil Procedure 37 to remedy any prejudice caused by spoliation." *Turner v. Public Service Co. of Colorado*, 563 F. 3d 1136, 1149 (10th Cir. 2009) (quoting *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1156 (7th Cir.1998)). "When a plaintiff fails to seek sanctions under Rule 37 and thus 'forecloses access to the substantial weaponry in the district court's arsenal,' the plaintiff's only remaining option is to seek sanctions under a spoliation of evidence theory." *Turner*, 563 F.3d at 1149 (quoting *Mathis*, 136 F.3d at 1155).

16

Sanctions for spoliation of evidence are appropriate when (1) a party had a duty to preserve the evidence because it knew, or should have known, that litigation was imminent, and (2) the other party was prejudiced by the destruction of the evidence. *Turner*, 563 F.3d at 1149. The burden is on the moving party to prove, by a preponderance of the evidence, that the opposing party failed to preserve evidence or destroyed it. *See In re Krause*, 367 B.R. 740, 764 (D.Kan.2007). Further, "Courts must take care not to 'hold [] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence,' because doing so 'would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction.'" *Essenter*, 2011 WL 124505 at 6 (quoting *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 109 (2d Cir. 2002)).

"District courts enjoy 'very broad discretion to use sanctions where necessary to insure . . . that lawyers and parties . . . fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial.'" *Lee v. Max Intern., L.L.C.*, 638 F.3d 1318 (10th Cir. 2011) (*citing In re Baker*, 744 F.2d 1438, 1440 (10th Cir.1984) (en banc)). "The district court's active participation in the discovery motions practice affords it a superior position than we — with but a cold record to review — for deciding what sanction best fits the discovery 'crime,' both as a matter of justice in the individual case and 'to deter [others] who might be tempted to [similar] conduct.'" *Lee* at 1320 (citing *Nat'l Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643 (1976)). Given the prior order sanctioning Creek County for destroying video, this motion presents a compelling case for deterrence.

A determination of the correct sanction for a discovery violation is a fact-specific inquiry. *See Phillips Electronics North America Corp. v. BC Technical*, 773 F.Supp.2d 1149, 1210 (D.Utah 2011). The court must consider a number of factors, and particularly those five set forth by the Tenth Circuit in *Ehrenhaus v. Reynolds*, 965 F.2d 916 (10th Cir.1992). *Id.* "The five *Ehrenhaus* factors are: "(1) [T]he degree of actual prejudice to the [party]; (2) the amount of interference with the judicial process; . . . (3)

17

the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions." *Ehrenhaus*, 965 F.2d at 921 (citations omitted). To determine what sanction would be appropriate for destroying relevant video, the court should examine each of the five *Ehrenhaus* factors.

### 1.   THE DEGREE OF ACTUAL PREJUDICE

Defendants' act of spoliation has caused extreme and irreversible prejudice to the Estate. "When considering the degree of prejudice suffered by the party that did not destroy the evidence, the court should take into account whether that party had a meaningful opportunity to examine the evidence in question before it was destroyed." *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 112 (E.D. Pa. 2005) (*quoting In re Wechsler*, 121 F. Supp. 2d 404, 416 (D. Del. 2000)).

Defendants had the opportunity to view the video before erasing it forever. Estate had no opportunity to examine the video, and none of the Defendants alerted the OSBI Investigator, the OCME, or the District Attorney's Office of the deleted footage. "When one side is completely deprived of the opportunity to inspect the evidence because it was destroyed after the other side had a chance to examine it, then sanctions for spoliation are generally appropriate." *Id.* at 112.  The present case goes beyond simple destruction, Defendants intentionally withheld information from the OCME, the OSBI, and the District Attorney's Office that would assist in their investigation, and despite that knowledge, Bowling and the CCJC leadership failed to take any steps in response to conduct worthy of the most serious sanction. As a consequence, the OSBI and FBI were unable to review any video that would show the amount and type of force used on Ronald as he exited the medical cell despite a camera pointed in that direction. The destruction of video also prevents the jury, Estate, investigators, and this Court from determining whether anyone checked on Ronald from outside the cell door, or whether jailers or the nurse were contributing to Ronald's decline by purposefully antagonizing him.

18

In *McCargo v. Texas Roadhouse, Inc.*, 2011 WL 1638992 (D.Colo. 2011), a defendant destroyed restaurant video that may have supported plaintiff's hostile work environment claim. In characterizing the prejudice, the Court stated "there is no way to know exactly what evidence Defendant destroyed, and there is no way to know how to place Plaintiff back into a position where it would not suffer significant prejudice as a result of Defendant's destruction of evidence." *McCargo*, at 10. The *McCargo* court declined to enter a default because the plaintiff had possession of the most damning piece of evidence.  Here, the Defendants destroyed the central piece of evidence: the conduct and behaviors of staff relative to Ronald and his condition in the 3 hours preceding the Incident, and it is reasonable to infer Defendants destroyed the video because that it was the most damning evidence of the contempt they exhibited towards Ronald. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir.1997) ("bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction.").

By destroying the video, Defendants have destroyed a critical piece of evidence that is irrefutable, purely objective, and devoid of any bias. No amount of testimony or after-the-fact report writing can replace what Defendants have destroyed, and what Defendants destroyed was not tangential or marginally relevant – it is the most critical evidence of Ronald's treatment and Defendants' knowledge leading up to the Incident. *See Rattray*, 761 F.Supp.2d at 847 ("even if the missing portion of the recording cannot be shown to be 'a smoking-gun,' 'the very fact that it is the only recording of' the incident in question is sufficient to show prejudice"). The prejudice to Estate is nothing short of dispositive – the entire case could rest on how a jury interpreted video from the booking room camera, and whether that video revealed contempt for Ronald that lead jailers to manufacture a second use of force incident.

## 2.   THE AMOUNT OF INTERFERENCE WITH THE JUDICIAL PROCESS

Destruction of the video prevents this Court from considering all the facts or submitting a full and complete case to the jury. As recognized in *Medcorp, Inc. v. Pinpoint Technologies, Inc.*, 2010 WL

2500301*3 (D.Colo. 2010), "any time a party destroys evidence presumably at odds with its case, the trial process is hampered because it may result in the jury having incomplete information." *See also Brigham Young University v. Pfizer, Inc.*, 262 F.R.D. 637, 645 (D.Utah 2009) (repeated delays in failing to provide relevant discovery is sufficient to support finding of interference with judicial process).

Effective operation of the judicial process turns on the cooperation of the parties. If parties knew they could destroy critical evidence with impunity, and thereby avoid liability, the judicial system could not function. In this sense, there is no greater interference with the judicial process than taking steps that would undermine the system altogether. The video destroyed by the county was certainly of an exculpatory character given incident reports acknowledging a use of force involving Fetters that would have been visible from the booking area camera. Based on the circumstances and other witness reports, it is reasonable to conclude the missing video would have depicted: (1) images of Ronald and his compliant behaviors despite being humiliated by Fetters' water toss; (2) a use of force in the medical cell doorway involving Fetters that was likely excessive and unjustified; and (3) behaviors showing jail staff tormenting Ronald from outside the detox cell door over the course of several hours.

In this case, the Defendants have destroyed evidence in a manner that precludes this Court from ever submitting a full and complete version of events to the jury, and there is no adequate method for replacing what the Defendants have destroyed. The destruction of evidence in this case is particularly prejudicial because unlike a lost document or email, there is no mechanism for offering any substituted evidence of what appeared on the video; there is no way to accurately recreate the images from the booking camera and present that evidence to a jury. For these reasons, Estate submits that Defendants' destruction of the video interferes with the very core of the judicial process.

### 3.    THE CULPABILITY OF THE LITIGANT

A strong degree of fault exists where "there has been an actual suppression or withholding of the evidence," as opposed to where "the document or article in question has been lost or accidentally

destroyed." *Gentex Corp. v. Sutter*, 2011 WL 5040893, 6 (M.D.Pa.2011) (quoting *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir.1995)).

Here, Defendants destroyed the video after saving it, and despite receipt of a preservation letter within 30 days. It is difficult to fathom more blameworthy conduct. Purposefully destroying saved video was not accidental, and the video was not mistakenly lost. Instead, Defendants made a conscience decision to craft their own video narrative of what occurred, destroy the portion they didn't like, and then present the doctored version as some legitimate preservation exercise.  It is not the province of the Defendants to edit the video to fit their narrative. No rational person would believe doctored video evidence is beneficial to resolving a case on the merits. To make matters worse, when the OSBI and OCME began their investigations, the Defendants failed to alert those agencies that video of an earlier use of force existed in the first instance, and that they unilaterally decided to destroy it. This behavior is illogical at best, but given the totality of circumstances, this conduct evinces an intent to obstruct an investigation, to suppress evidence, and to gain an advantage in future litigation.

When Defendants destroyed the video, they made a calculated gamble that the risk of getting caught was worth the penalty of destruction. Such an analysis demonstrates that Defendants' destruction of video was accompanied by the highest degree of culpability. There is no better evidence of this calculated obstruction than Defendants' prolonged delay in the face of Estate's efforts to simply review the DVR. After telling Estate all video was saved, Defendants repeatedly delayed and ultimately feigned ignorance about the difference between a flash drive and DVR before refusing to cooperate at all once Estate determined that defense counsel never had the DVR in the first instance, and had no idea where it was located. (Doc. 141).

### 4.    WHETHER THE COURT WARNED THE PARTY IN ADVANCE

"An explicit warning that dismissal is likely is not a prerequisite to the imposition of dismissal sanctions." *Phillips Electronics*, *supra* at 1156 (internal citation omitted). In *Phillips*, the Report and

Recommendation adopted by the district court noted that the defendant was represented by sophisticated counsel and that case law placed defendant on notice that "default judgment may result from destruction of evidence." *Phillips*, 773 F.Supp.2d at 1212.  This is consistent with the *Ehrenhaus* decision which held that its five factors are not a "rigid test." *Ehrenhaus,* 965 F.2d at 921.

Although this Court did not have an opportunity to issue a warning before Defendants destroyed the video, Judge Dowdell issued a sanction order in 2015 that provided Defendants with unambiguous notice that destruction of jail video could result in a dispositive sanction. Despite the existence of that warning, and with indifference to the potential for sanctions, Creek County once again decided that destroying video was worth the risk. This is an intolerable gamble for any litigant, and it strongly suggests that Creek County simply does not believe the risk of destruction outweighs the benefit. This Court must disabuse Creek County of the notion that destruction of evidence is acceptable, and it is clear that only the most serious sanction will have any hope of getting its attention.

Finally, Defendants are represented by sophisticated counsel, and the destruction occurred before this Court had an opportunity to issue a warning. It is illogical to allow a party to escape a dispositive sanction for lack of a prior warning where the spoliation occurred before a warning could issue. In fact, in this case opposing counsel explicitly told Estate's counsel from the outset that all video was saved before later confessing 9 months later that all counsel had was a flash drive. (Doc. 141). While counsel's representation was technically true--all video was saved--it was materially misleading because portions were later destroyed. Accordingly, Plaintiff submits that this element of the *Ehrenhaus* factors does not readily apply, except for the notice provided by Judge Dowdell's prior order.

## 5.    THE EFFICACY OF LESSER SANCTIONS

Sanctions for the destruction of evidence serve the three distinct remedial purposes of punishment, accuracy, and compensation. *United States v. Koch Indus., Inc.*, 197 F.R.D. 463, 483 (N.D.Okla.1998). "A court should select the least onerous sanction necessary to serve these remedial purposes. The severity

of the sanction selected for spoliation of evidence should be a function of and correspond to the willfulness of the spoliator's destructive act and the prejudice suffered by the non-spoliating party." *Id.* at 483. As a general rule, the "bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." *Aramburu*, 112 F.3d at 1407 (*citing Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir.1985)).

A failure to preserve evidence may be negligent, grossly negligent, or willful, but the intentional destruction of relevant records—either paper or electronic—is clearly willful conduct. *See Philips*, 773 F.Supp.2d at 1202-03. After the duty to preserve attaches, the failure to collect paper or electronic records from key players, the destruction of email, or the destruction of backup tapes is grossly negligent or willful behavior. *Id.* Moreover, "[b]ad faith, or culpability, 'may not mean evil intent, but may simply signify responsibility and control.'" *Id.* (quoting *Phillip M. Adams & Associates, L.L. C. v. Dell, Inc.*, 621 F.Supp.2d 1173, 1193 (D.Utah 2009)). Ultimately, the hallmark, or the "[t]he fundamental element," of bad faith "is advantage-seeking behavior by the party with superior access to information necessary for the proper administration of justice." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1326 (Fed.Cir.2011).

In the Tenth Circuit, a dispositive sanction may be imposed only when the failure to comply with discovery demands is the result of willfulness, bad faith, or some fault of a party other than inability to comply. *See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 208–10 (1958); *Nat'l Hockey League*, 427 U.S. at 640; *FDIC v. Daily*, 973 F.2d 1525, 1529 (10th Cir.1992); *Gocolay v. New Mexico Federal Savings & Loan Assoc.*, 968 F.2d 1017, 1020 (10th Cir. 1992). A "willful failure" is defined as "'any intentional failure as distinguished from involuntary noncompliance. <u>No wrongful intent need be shown</u>.'" *In re Standard Metals*, 817 F.2d 625, 628–29 (10th Cir.1987) (quoting *Patterson v. C.I.T. Corp.*, 352 F.2d 333, 336 (10th Cir.1965)) (emphasis added).

23

Where no willfulness, bad faith or fault is shown from the evidence, a dispositive sanction would be improper. *Gocolay*, 968 F.2d at 1020. On the other hand, *serious* sanctions are warranted in cases where the judge finds willfulness or bad faith. This is so because actions which are found to be deliberate and purposeful ought to be punished accordingly. *Anderson v. Cryovac*, 862 F.2d 910, 925 (1st Cir.1988).

In *E.E.O.C. v. Dillon Companies, Inc.*, 839 F.Supp.2d 1141 (D. Colo.2011), the district court was tasked with determining whether taping over a master copy of video and allowing the DVR recording to expire constituted bad faith under the *Aramburu* standard. In *Dillon*, the "defendant clearly recognized the need to maintain a copy of the videotape; that is the reason — allegedly per company policy — that a master-copy was created." *Id*. at 1145. "Only specific persons had access to the master-copy, and one of them intentionally created a work-around to allow the master to be taped over, again in violation of company policy." *Id*. The court did not require any additional evidence to conclude that destruction of the video satisfied the *Armburu* standard. *Id*. ("This alone indicates bad faith . . . This is exactly the type of case where sanctions for spoliation of evidence are appropriate"). The same is true here.

As in *Dillon Companies*, Defendants "clearly recognized the need to maintain a copy" but "one of them created a work-around" to ensure that a jury would never see video of what happened to Ronald in the doorway to medical or the conduct outside his cell door. No lesser sanction than entry of a default judgment can remedy the substantial prejudice that Estate has suffered by Defendants' spoliation.  As one Court noted, "Default judgment is a proportional response . . . given [defendants] unabashedly intentional destruction of relevant, irretrievable evidence." *Gentex Corp*, 2011 WL 5040893 at 6. In *Gentex*, the defendants intentionally deleted a host of computer data that may have benefited the plaintiff. In granting a default, the Court also recognized the deterrent value of the sanction. *Id*. ("I am especially conscious of the deterrence value of harsh sanctions in cases like this where the crucial evidence exists in electronic form, and a party may destroy its opponent's case with the mere click of a button."). The same is true here – Estate can never recover what Defendants have destroyed, and no instruction to a jury can adequately

24

replace purely objective video evidence.

In *Computer Associates Intern., Inc., v. American Fundware, Inc.*, 133 F.R.D. 166 (D.Colo. 1990) the defendant destroyed source codes that were central to the case, and did so after litigation was reasonably foreseeable. In that case, the Court held that no lesser sanction than default could remedy the injustice:

> I find and conclude that no alternative sanction short of a default judgment would adequately punish AF and deter future like-minded litigants. Any lesser sanction would allow a party possessing evidence that would insure an adverse result to destroy that evidence with impunity, thus assuring defeat for the opponent while risking only a comparatively mild rebuke. One who anticipates that compliance with discovery rules, and the resulting production of damning evidence, will produce an adverse judgment, will not likely be deterred from destroying that decisive evidence by any sanction less than the adverse judgment he (or she) is tempted to thus evade. It follows that the only sanction adequate and appropriate to punish AF and deter future similarly situated litigants is default judgment on liability.

*Computer Assoc. Intern., Inc.*, 133 F.R.D. at 170.

Expounding on the logic of *Computer Associates*, the Report and Recommendation in *Phillips* made the following observation about the willful destruction of electronically stored information:

> [C]ourts have recognized that if parties are willing to take the risk and balance destroying evidence against turning over the proverbial smoking gun, knowing that the destruction will not result in the ultimate judgment, destruction of important evidence will occur. The court must not inherently reward the misbehavior of companies and individuals who want to destroy incriminating evidence rather than produce it and have a judgment entered against them; litigants must be strongly discouraged, rather than encouraged in any way, to become more and more clever about how to delete and hide the destruction of electronic documents.

*Phillips*, 773 F.Supp.2d at 1213.

The rationale of *Computer Associates* and *Phillips* is equally true here. There was no logical reason for Defendants to destroy saved video unless that video depicted acts or evidence that would assure defeat in this court and risk the criminal prosecution of CCJC leadership or employees.

The only logical explanation for the destruction is that Defendants made a deliberate decision to destroy video betting that the reward of destruction would outweigh the risk of production or any subsequent penalty. Indeed, preservation of the video is simple, cost effective, <u>and something that was done after the incident</u>. By purposefully destroying the video, Defendants insulated themselves from potential criminal and civil penalties while distorting the context in which the second and fatal use of force occurred. By destroying the video, Defendants can present a misleading narrative to the jury with impunity. Any sanction less than default cannot adequately restore Estate to the position that it would be in had Defendants preserved the video, and no other sanction creates a disincentive that would dissuade these or other Defendants from committing rampant discovery abuses in the future.

Even assuming this Court could fashion an adverse inference, there is no way that a jury could accurately determine if that instruction is commensurate with the discovery "crime." Further, prohibiting the Defendants from presenting a defense does not provide the jury with the video images destroyed by the Defendants. Perhaps more importantly, this Court must dissuade Defendants and others from engaging in the type of risk/reward analysis that might tempt future jailers and administrators to destroy vital evidence in the future to create shame alibis to defeat subsequent civil or criminal liability. And the need to dissuade Creek County is manifest; the prior sanction order from Judge Dowdell was clearly insufficient.

Creek County is a repeat offender and considerations of future deterrence are well-recognized when considering sanctions. This fact underscores the importance that courts place on a litigant's responsibility to preserve evidence, and the ultimate harm that results when a party can destroy a case with the push of a button. Given the totality of circumstances of this particular case, a dispositive sanction is justified, along with all costs and fees incurred that are reasonable and necessary for the preparation and presentation of this motion.

C.     ASSUMING *ARGUENDO* THE COURT DOES NOT CONSIDER DEFAULT IS NECESSARY,
       ESTATE REQUESTS A LESSER SANCTION

"The court, of course, may impose lesser sanctions absent a finding of bad faith." *Henning v. Union Pacific R. Co.*, 530 F. 3d 1206, 1220 (10th Cir. 2008) (citing *Estate of Trentadue v. United States*, 397 F.3d 840, 862 (10th Cir.2005) ("The district court has discretion to fashion an appropriate remedy depending on the culpability of the responsible party and whether the evidence was relevant to proof of an issue at trial.").

In *Peschel*, *supra*, the district court declined to enter default following destruction of relevant use of force video from a police dash camera, but it recognized the irreversible prejudice to plaintiff's case. The court rejected the defendant's proposed solutions: to allow others to testify as to what they saw:

> The mischief in the proposal lies in the fact there would effectively be no sanction whatsoever for the City's spoliation of the best evidence of what occurred during the arrest of Peschel. The purported sanction would have absolutely no punitive, deterrent, or remedial value. It is cavalier to suggest otherwise. At worst, the Court would be effectively condoning the spoliation of the best evidence available to resolve the factual dispute with the greatest accuracy. The importance of video recordings to the fair, accurate, and expeditious resolution of disputes emanating from encounters between law enforcement and the public cannot be overstated. The Court would be remiss to simply ignore, as suggested by the City, the spoliation of the video recording.

*Id*. at 1145.

As set forth above, the Court enjoys broad discretion when deciding what sanctions to impose. Assuming *arguendo* the Court concludes that default is not warranted at this juncture, Estate proposes the Court further impose any one or combination of the following:

> 1.     A mandatory adverse inference instruction to the jury that Defendants destroyed relevant video images that were damaging to their position at trial, with specific language to be submitted upon subsequent application of the Estate;
>
> 2.     A rebuttable presumption to the jury that Defendants destroyed relevant video images that were damaging to their position at trial, with specific language to be submitted upon subsequent application of the Estate;
>
> 3.     Precluding Defendants from presenting any argument or defense

27

that might be refuted by the missing video;

4.     Referral of the matter to the United States Attorney for the Northern District of Oklahoma for consideration of criminal charges;[2]

5.     Waiver of the attorney client and work product privilege;

6.     Imposing Estate's costs and attorney fees on Defendants up to the present date;

7.     Imposing Estate's costs and attorney fees on Defendants regardless of the outcome at trial;[3]

8.     The exclusion of any reference to Ronald's toxicology;

9.     Any other relief the Court deems just and equitable.

## III.

### CONCLUSION

Defendants destroyed video in violation of their preservation duties, or alternatively, they knowingly failed to take steps to ensure the video was not protected from destruction. At the time of the Incident, Fetters knew Ronald was older, dry celled, begging for water, needed an assessment ASAP, was actively hallucinating, suffering through hours of torment, had experienced an earlier humiliation having water thrown in his face, and experienced a prior use of force at the hands of Fetters himself in the doorway to medical. For someone hallucinating, it was entirely reasonable for Ronald to believe that Fetters intended to cause him harm, and he was right.

Based on these circumstances, a jury is entitled to know how the use of force in the doorway to medical played out, and whether it was similar to what happened in the doorway to detox. Both force incidents involved Fetters and both happened in a doorway. Simialrly, the jury is entitled to know if staff were checking on Ronald or antagonizing him and making the situation worse. Unfortunately, the jury will never get the answers to those question because the video was destroyed. There is no way to put

---

[2]*See SonoMedica, Inc. v. Mohler*, 2009 WL 2371507, at *1 (E.D.Va. July 28, 2009).
[3]*See Switzer v. Much, Shelist, Freed, Denenberg, Ament, Bell & Rubenstein, P.C.*, 214 F.R.D. 682 (W.D.Okla. 2003) (requiring party to pay attorney fee's of opposing party regardless of outcome of trial).

Estate back in the position of having the missing video, and a jury's determination may ultimately turn on whether Ronald acted reasonably in light of the prior treatment. The prejudice is dispositive. For these reasons, Estate respectfully requests the Court enter a sanction that appropriately fits the discovery crime.

**WHEREFORE**, all premises considered, Estate respectfully requests the Court grant the motion for sanctions and enter a default judgment against one or more of the Defendants. In the alternative, Estate respectfully requests the Court impose any one or combination of the alternative sanctions identified above, along with all costs and expenses incurred, and any other relief the Court deems just and equitable.

Respectfully submitted,

BRYAN & TERRILL

_s/J. Spencer Bryan_
J. Spencer Bryan, OBA # 19419
Steven J. Terrill, OBA # 20869
BRYAN & TERRILL LAW, PLLC
3015 E. Skelly Dr., Suite 400
Tulsa, OK 74105
Tele/Fax:      (918) 935-2777
jsbryan@bryanterrill.com
_Attorneys for Plaintiff_

## CERTIFICATE OF SERVICE

I certify that I transmitted this document to the clerk of the court using the CM/ECF system.

_s/J. Spencer Bryan_
J. Spencer Bryan

29